MCCLANAHAN INGLES, ET AL.

v.

ROBERT C. DIVELY, ET AL.

Record No. 921705

September 17, 1993

Present: All the Justices

*A. Davis Bugg, Jr. (Charles S. Russell, Jr.; Rumsey, Breeden, Hubbard, Bugg & Terry*, on briefs), for appellants.

*William D. Bayliss (Dana D. McDaniel; Williams, Mullen, Christian & Dobbins*, on brief), for appellees.

JUSTICE LACY delivered the opinion of the Court.

In this defamation case, Robert C. Dively sued McClanahan Ingles seeking damages for Ingles's statements describing Dively, *inter alia*, as a criminal, a thief, and a convicted thief. The jury returned a verdict for Dively, awarding him both compensatory and punitive damages. On appeal, we consider Ingles's assertions that the trial court erred in admitting a newspaper article into evidence because its probative value was outweighed by its prejudicial effect on the jury, that Ingles's statements were not defamatory as a matter of law, and that the evidence was insufficient to support an award of punitive damages.

## FACTS

This case arises from incidents that occurred when the business relationship between Dively and Ingles deteriorated. Dively and Ingles met in the course of a marina construction project. Ingles was an investor in the project and Dively was the construction manager. In September 1984, the two men formed Sea Technology, Ltd. (STL) to build and to sell the "Sea Tech Docksider" (the Docksider). The Docksider is a marine utility power pedestal that can be mounted on a dock to provide, in one unit, water, electrical, television, and telephone hookups used by large yachts. Dively and Ingles each held fifty percent of the corporation's stock. Ingles provided the capital. Dively was the president and chief executive officer and was responsible for the day-to-day business operations.

Dively and Ingles were involved in other joint businesses as well as ventures undertaken separately. For example, United Metering was a joint venture, while Willoughby Marina was one of Ingles's individual enterprises. In 1987 Dively incorporated Marina Technology, Ltd. (MTL) to develop and to sell a "Dock Box" that consists of a fiberglass container mounted on the end of a marine utility power pedestal. The Dock Box provides separate storage space and a power source for users of each side of the unit. Both Dively and Ingles used the Docksider pedestal in their other business ventures.

Beginning in 1988 Dively and Ingles received offers to buy STL. None of these offers resulted in the sale of the corporation. When the boating market began to decline in 1989, STL laid off personnel and Dively did not receive a salary from STL for several months. In December 1989 Dively told Ingles that STL needed additional capital to "retool" and to meet new Underwriters Laboratories specifications in order to remain competitive. Ingles rejected the suggestion.

On March 9, 1990, Dively resigned from STL. He instructed an STL employee to take his personal tools from the STL premises to the MTL offices. He also left instructions with the STL bookkeeper to invoice MTL for STL material and labor used in MTL projects. Following Dively's departure from STL, various legal actions ensued.

Ingles retained counsel to file a civil suit against Dively in which he sought to enjoin Dively from soliciting STL customers or selling or profiting from the Docksider or the Dock Box; to recover compensatory and punitive damages, as well as costs incurred in the sale of such items; and to request an accounting and other relief. Dively also filed suit seeking dissolution and liquidation of STL as well as the return of corporate assets that Dively claimed Ingles misappropriated, diverted, or wasted.

On April 11, 1990, the trial court denied Ingles's petition for a temporary injunction, but ordered Dively to return to STL any STL property he had taken to MTL's premises when he resigned. The trial court consolidated the two cases by agreement of the parties. Ultimately, on July 1, 1992, after a five day hearing, the trial court entered an order holding that Dively owned fifty percent of the stock in STL, and that no trade secrets were involved in the "manufacture and sale" of the Docksider and the Dock Box. The trial court entered judgment for the defendants in each of the cases.

On April 12, 1990, Ingles met with Investigator William W. Adams of the Gloucester County Sheriff's Department. As a result of that meeting and further investigation, the Gloucester County Commonwealth's Attorney sought indictments against Dively. A Gloucester County grand jury returned the indictments on May 7, 1990. The indictments charged that Dively had embezzled funds from STL in conjunction with projects for Poole's Grant Marina, Dock of the Bay Marina, and Shark Island Marina and that he had embezzled tools from both Lower Chesapeake Associates and STL. The grand jury returned a sixth indictment on July 27, charging that Dively had embezzled STL funds from a project with Pelican Harbor Marina.

The indictments were based on Ingles's assertion that Dively used STL materials and labor to complete MTL contracts that Dively, as MTL president, executed with the four marinas. Ingles asserted that Dively embezzled funds from STL when he retained the funds received under the MTL marina contracts for MTL's benefit and did not pay for the STL materials and labor. The tool embezzlement charges were based on Dively's directions to an STL employee to remove certain items from STL and to transfer them to MTL's premises on the day Dively resigned.

The Gloucester County Commonwealth's Attorney *nolle prossed* the tool embezzlement charges and Dively was tried on the remaining four embezzlement indictments. On March 29, 1991, at the close of the Commonwealth's evidence, the trial court granted the defense's motion to strike the evidence and dismissed the remaining indictments.

## PROCEDURAL HISTORY

On April 26, 1991, Dively filed this action against Ingles alleging defamation, *inter alia.** Dively asserted that, during the summer of 1990, Ingles had conversations with MTL customers and potential

---

\* Dively also claimed abuse of process, intentional infliction of emotional distress, violation of Code § 8.01-45 (insulting words), and tortious interference with potential economic relationship. Dively nonsuited his insulting words and tortious interference with potential economic relationship claims. The trial court granted Ingles's motion to strike the evidence on the abuse of process claim. The jury found for the defendant on the intentional infliction of emotional distress and malicious prosecution claims. Dively appealed by way of cross-error only the malicious prosecution portion of the judgment. This Court denied the cross-error at the petition stage of this appeal.

MTL customers in which Ingles falsely stated that Dively was a criminal, had stolen from STL, and could not be trusted. Dively contended that these statements were defamatory *per se* and damaged both his reputation and his standing in the community.

Following a five day trial, the jury returned a verdict in favor of Dively on the defamation count, awarding him $50,000 in compensatory damages and $100,000 in punitive damages. After denying Ingles's motion to set aside the verdict, the trial court entered judgment on the verdict on August 7, 1992. Ingles appealed.

## DISCUSSION

### 1. Newspaper Article

■ Ingles initially seeks reversal based on the trial court's error in admitting into evidence a newspaper article which he asserts substantially prejudiced his position. Following the conclusion of Dively's criminal trial, a local newspaper published an article that described the results of the trial and contained the following:

> According to the transcript of the ruling, [Judge] Bateman was astounded at the speculation on which the prosecution based its case.

Dively sought to introduce this article into evidence stating it was "not offered for the truth or falsity" of the information it contained, but to show "what people saw in the community." The trial court overruled Ingles's objection and allowed the entire article into evidence, denying Ingles's request to at a minimum strike the above-quoted sentence.

Ingles contends that the trial court committed reversible error in this regard. Ingles argues that even if the article was admissible under an exception to the hearsay rule, and even if the article was relevant for some purpose, the prejudicial effect of the comments attributed to the judge outweighed their probative value.

■ The judge's observations recited in the article go directly to the validity of the charges that the Commonwealth brought against Dively and cannot be dismissed as merely part of the community's knowledge of the case. The jury was well aware that the indictments resulted from Ingles's initial approach to the Commonwealth's Attorney and, consequently, the prejudice to Ingles was inescapable and pervaded all facets of the proceeding.

While weighing the prejudicial effect of evidence against its probative value is a matter largely within the discretion of the trial court, *Gray v. Graham*, 231 Va. 1, 10, 341 S.E.2d 153, 158 (1986), here the observations of the trial judge in Dively's criminal case had a substantial prejudicial effect on Ingles's position which was not outweighed by any probative value.

We conclude that the trial court's refusal to grant Ingles's motion to strike the sentence concerning the judge's statement before admitting the newspaper article into evidence constituted an abuse of discretion. Accordingly, we will reverse the judgment of the trial court on this basis.

The relief that Ingles seeks from this Court is not limited to a remand for a new trial free of the offending evidence. Ingles asserts that we should enter final judgment for him here because, with one exception, the statements at issue were not defamatory as a matter of law and the evidence was insufficient to support an award of punitive damages. We will consider these claims in order to fashion the appropriate disposition for this case.

## 2. Defamation

Dively relied on the following evidence to support his defamation claim:

(1) Allison King, an employee at Shark Island Marina, testified that in mid-March, Ingles came to the marina and "called Mr. Dively a thief, a liar, a forger."

(2) Miles Booth, a representative of a plastics manufacturing firm that supplied materials to MTL and STL, testified that in April, Ingles told him that Dively had "taken his property and that he was a crook and he was going to put him in jail."

(3) Gary McAllister, a developer of Poole's Grant Condominiums and Marina, testified that in June 1990, Ingles stated that Dively "was a thief, an embezzler and had used his labor and materials from Sea Technology to build my marina and . . . that he was going to put him away."

(4) William Tindal, a supervisor of marina refurbishment for Westrec Properties, had received a bid from Dively after

Dively left STL. Tindal testified that at a meeting in August Ingles said Dively "stole things from [STL], tools and parts and materials, and [Ingles was] fixing to take [Dively] into litigation and if [Tindal goes] ahead and order[s] this new pedestal from [Dively] the chances are [Tindal] won't be able to receive it because [Ingles is] going to have [Dively] in court and he'll probably be in jail."

(5) Jon J. Taylor had worked with Dively in the past on marina designs. On August 6 Ingles set up a meeting with Taylor about possible work on Bald Head Island. Taylor testified that during that meeting Ingles "indicated to me that Mr. Dively had been found guilty of some felonies and had been put in handcuffs and led away."

█ To recover actual or compensatory damages for defamation, Dively, a private individual, had to prove by a preponderance of the evidence that these statements were false and that Ingles either knew the statements were false or, believing them to be true, lacked reasonable grounds for such belief or acted negligently in failing to ascertain the truth. *Gazette, Inc.* v. *Harris*, 229 Va. 1, 15, 325 S.E.2d 713, 724-25, *cert. denied*, 472 U.S. 1032, *cert. denied*, 473 U.S. 905 (1985).

Ingles argues that, with the exception of the statement to Taylor, he reasonably believed that the statements were true and he was not negligent in failing to ascertain their accuracy. Accordingly, Ingles asserts that he is entitled to judgment in his favor on these statements. In considering the contentions regarding these four statements, we review the evidence in the light most favorable to Dively and will reverse the trial court's action only if it was plainly wrong or there was no credible evidence to support the verdict. *Gazette*, 229 Va. at 20, 325 S.E.2d at 728.

Ingles's claim that these four statements were not defamatory as a matter of law is based on the premise that since the Commonwealth's Attorney believed Dively's actions were criminal, then Ingles necessarily had reasonable grounds to believe the statements he made were true. We disagree.

█ The Commonwealth's Attorney took actions based primarily on interviews and information that Ingles and his attorneys provided. More importantly, the opinion and actions of the Commonwealth's Attorney neither relieve Ingles of his duty to ascertain the

truth nor provide a *per se* justification for a negligent failure to do so. Accordingly, we must review the record to determine if Dively produced credible evidence from which a jury could conclude that Ingles lacked reasonable grounds to believe that the statements he made were true or to show that Ingles was negligent in failing to ascertain their accuracy.

The record contains documents and testimony regarding the financial relationship between STL and MTL, including Dively's instructions to an STL employee to invoice MTL for materials and labor used by MTL in contracts with marinas. Those instructions were embodied in papers attached to a document referred to as the "Hogge memorandum." This document, left on the desk of the STL bookkeeper on March 18, indicates that MTL was to be billed for $738 in parts and a total of $11,400.95 for parts and labor. This amount, as shown on the papers, included over $1,000 attributable to the Shark Island project and $2,520 in labor costs and $7,975 for 29 pedestals that an STL employee testified were for the Dock of the Bay Marina job.

With regard to the Poole's Grant project, Ingles contends that Dively stole from STL because Dively received a check from the marina made out to STL, endorsed it over to MTL, and deposited it to MTL's account, without paying STL for the parts used in the project. The record, however, contains STL's invoice to MTL, dated February 28, 1989, for over $14,000 for parts used in the Poole's Grant project. The testimonial evidence was that Poole's Grant contracted with MTL, not with STL, and, according to the bookkeeper for Poole's Grant, the check was made out to STL in error and an offer to change the payee to MTL was made.

Although Ingles asserts that he was entitled to believe that Dively embezzled money from STL, this evidence indicates a business relationship in which the contractor, MTL, has been billed by, but has not paid, his supplier, STL. Ingles had access to these documentary items prior to his meeting with the Commonwealth's Attorney and prior to making the allegedly defamatory statements. At least three of the statements occurred after Ingles had been unsuccessful in his suit to enjoin Dively. During that injunction hearing, Ingles learned that Dively claimed that the allegedly stolen tools were removed by mistake. The trial court ordered return of these tools.

Considering the entire record, we find that, while the evidence was conflicting, there was credible evidence to justify the trial court's decision to send to the jury the issue of the reasonableness

of Ingles's belief in the truth of his statements regarding the criminal nature of Dively's actions, and the question whether he was negligent in ascertaining the truth of the matter. Accordingly, we reject Ingles's contention that these four statements were not defamatory as a matter of law.

Ingles concedes that the content of the statement allegedly made to Taylor was defamatory, but argues that he did not make this statement. Ingles says the jury agreed that he did not make the Taylor statement because it placed an "n" on a jury instruction next to the Taylor statement while it placed a "y" next to the other allegedly defamatory statements.

■ We share the virtually unanimous view of courts across this country that a court should not engage in speculation over the meaning of notations made by jury members on the verdict form during the deliberative process. See *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 110 (2d Cir. 1985); *Domeracki v. Humble Oil & Ref. Co.*, 443 F.2d 1245, 1247-48 (3d Cir.), *cert. denied*, 404 U.S. 883 (1971); *Cosie v. Aetna Casualty & Sur. Ins. Co.*, 527 So. 2d 1105, 1107 (La. App. 1988); and *Wannamaker v. Traywick*, 134 S.E. 234, 237-38 (N.C. 1926). Accordingly, the notations on the jury instructions and verdict forms with respect to the Taylor statement do not constitute a basis for entry of judgment in Ingles's favor on that statement. See *Washington Park Co. v. Goodrich*, 110 Va. 692, 696-97, 66 S.E. 977, 978-79 (1910).

### 3. Punitive Damages

Finally, Ingles asserts that he is entitled to reversal of the award of punitive damages based on all the statements, except the Taylor statement, because the evidence was insufficient to support a punitive damage award. We agree.

■ To recover punitive damages for defamation, Dively was required to prove by clear and convincing evidence that Ingles either knew the statements he made were false at the time he made them, or that he made them with a reckless disregard for their truth. *Gazette*, 229 Va. at 13, 325 S.E.2d at 724, citing *Fleming v. Moore*, 221 Va. 884, 893-94, 275 S.E.2d 632 (1981). On this issue, we conduct an "independent examination of the whole record" to determine whether Dively met that burden. *Gazette*, 229 Va. at 19, 325 S.E.2d at 727.

 As we discussed above, the record contained conflicting evidence regarding whether the statements met the criteria for defamation. Such conflict could be resolved by the jury based on credible evidence. Nevertheless, the evidence in this record is not sufficient to support a finding that Ingles made the statements with the required knowledge of their falsity or reckless disregard for truth under the applicable clear and convincing proof standard. While the defamation issue was properly submitted to the jury, we conclude that, as a matter of law, Dively failed to meet his burden of proof to support punitive damages with regard to these four statements.

## CONCLUSION

For the reasons discussed above, we will reverse the judgment of the trial court and remand the case for a new trial on the defamation claim based on all statements and on the punitive damage claim based solely on the Taylor statement.

*Reversed and remanded.*